**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| KROY IP HOLDINGS, L.L.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:13-CV-888-WCB |
| | § | LEAD CASE |
| AUTOZONE, INC., | § | |
| | § | |
| Defendant. | § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

On November 19, 2014, the Court held a hearing to determine the proper construction of

the disputed claim terms in U.S. Patent No. 7,054,830 ("the '830 patent"), owned by plaintiff

Kroy IP Holdings, LLC.  After considering the arguments made by the parties in their claim

construction briefing (Dkt. Nos. 82, 85, and 91) and at the claim construction hearing, and with

due consideration of the claim construction orders relating to the same patent in the related case

of Kroy IP Holdings, LLC v.  Safeway, Inc., No. 2:12-cv-800, the Court issues the following

construction of the terms as to which the parties disagree.

## I.  BACKGROUND

The '830 patent, entitled "System and Method for Incentive Programs and Award

Fulfillment," is directed to the use of computers and the Internet to design and implement

incentive award systems that can be used to promote merchants' products and services to

consumers.  The two independent claims of the '830 patent, claims 1 and 19, recite as follows:

1

1.  A system for incentive program participation and automated award fulfillment, comprising:

> a host computer coupled to a network;
> a first database accessible from said host computer; and
> an automated award fulfillment application executed on said host computer for participation in incentive programs of a plurality of providers in communication with an inventory management system associated with each of said plurality of providers wherein said automated award fulfillment application program provides sponsor-selected fulfillment, said automated award fulfillment application program comprising:
>
>> code adapted to provide a sponsor-selected specific award unit item, said sponsor-selected specific award unit item being tailored to demographic and psychographic preferences of a sponsor-selected consumer user, and
>>
>> code adapted to provide a sponsor-selected geographic location for fulfillment.

19.  A method for providing an incentive program and automating award fulfillment, comprising:

> providing a host computer;
> providing an incentive program on the host computer, wherein a participant may participate in said incentive program;
> providing a database of awards on the host computer associated with the incentive program; and
> providing automated award fulfillment of said awards to participants, including providing communications with an inventory management system associated with each of a plurality of providers wherein said automated award fulfillment comprises
>
>> providing sponsor-selected fulfillment comprising
>>
>>> providing a sponsor-selected specific award unit item,
>>> providing said sponsor-selected specific award unit item tailored according to demographic and psychographic preferences of a sponsor-selected consumer user, and
>>> providing a sponsor-selected geographic location for fulfillment.

The '830 patent is the subject of ongoing litigation in the <u>Safeway</u> case, in which the Court issued two previous claim construction orders.  <u>See</u> case no. 2:12-cv-800, Dkt. Nos. 90 and 141.  The parties in this case now ask the Court to construe some of the same terms and some additional terms; with respect to certain claim terms, the defendants have asked the Court to

adopt a claim construction different from the one it adopted in the <u>Safeway</u> case. The Court will address each of the disputed claim terms in the order in which they appear in the parties' briefs.

## II. DISCUSSION

**1. "[in] communication with an inventory management system" and "an inventory management system"**

The plaintiff's proposed construction of "in communication with an inventory management system, as used in claim 1 and claim 19 is: No construction is necessary apart from the construction of "an inventory management system."

The plaintiff's proposed construction of "an inventory management system," as used in claim 1 and claim 19, is: "at least one system that provides an inventory of an item (e.g., merchandise) or types of items (e.g., coupons, points, services) recorded in the award database."

The defendants' proposed construction of "in communication with an inventory management system," as used in claim 1, is: "which electronically connects an awards database to a system that provides a quantity of items (i.e., products or services) or types of items (i.e., categories of products or services) currently available for redemption in a retailer's inventory."

The defendants' proposed construction of "in communication with an inventory management system," as used in claim 19, is: "an electronic connection between an awards database and a system that provides a quantity of items (i.e., products or services) or types of items (i.e., categories of products or services) currently available for redemption in a retailer's inventory."

Defendant Starbucks' proposed construction of "[in] communication with an inventory management system," as used in both claim 1 and claim 19, is: "at least one system that

provides an inventory of award unit items (i.e. products or services) currently available for redemption electronically connected to a software program used for award fulfillment."

The Court in the Safeway case construed the term "inventory management system" as: "At least one system that provides an inventory of an item (e.g., merchandise) or types of items (e.g., coupons, points, services) recorded in the award database." See Safeway, Dkt. No. 90, at 40-45; Dkt. No. 141, at 5-7. The Safeway Court did not construe the words "[in] communication with."

Analysis: The claim language requiring "communication with an inventory management system" is very broad. It does not require any particular type of communication or any particular type of inventory management system. It is enough, according to Kroy, that the automated award fulfillment application program on the host computer is in electronic communication with an inventory management system associated with each provider.

The defendants make several arguments as to how the "[in] communication with an inventory management system" limitation should be construed.

**a.** First, the defendants contend that the term "inventory management system" should be limited to the inventory management system of a retailer. While there is nothing in the claim language to support that restrictive reading, the defendants urge that portions of the specification and Kroy's statements in its brief in response to a request for inter partes review before the Patent Trial and Appeal Board ("PTAB") require that the limitation be construed in that manner. After examining the specification and the statements Kroy made to the PTAB, the Court is satisfied that, read in context, neither the specification nor the statements to the PTAB constitute

a representation by Kroy that the "inventory management system" referred to in the claims is limited to inventory management systems maintained by retailers.

Nothing in the specification limits the claimed inventory management systems to those of retailers, as that term is generally understood. Importantly, the patent expressly defines "retailer," and it does so in a manner that gives that term a very broad definition for purposes of the patent, much broader than the definition of the term as ordinarily used. The term "retailer," according to the specification, "encompasses any individual or company that wishes to provide awards and prizes to be associated with incentive programs." '830 patent, col. 7, ll. 54-56. In light of that very broad definition of "retailer," even if the patent were construed as limited to "retailers," it would still apply to any entity providing prizes associated with incentive programs, even if the entity were not a "retailer" in the ordinary sense of that term. Accordingly, limiting the scope of the claims to "retailers," as that term is commonly understood, would create the risk of artificially and improperly narrowing the patent in a manner contrary to its terms.

Because of the potential for confusion arising from the breadth of the patent's definition of the term "retailer," the Court will use the ordinary meaning of the term "retailer" in the course of its analysis of the claims' scope. However, it is important to keep in mind that the patent's broad definition of "retailer" provides the first, and simplest, answer to the defendants' arguments that the patent must be read narrowly as applicable only to retailers, as that term is used in common parlance.

While it is clear from the specification that the inventory management systems can be those of retailers, and frequently will be, the specification does not indicate that the term must be limited to "retailers," as that term is ordinarily used. For example, Figure 2 of the patent and the

associated text in the specification provides an example of the operation of the invention, illustrating the "particular systems necessary for operation of the present invention." '830 patent, col. 10, ll. 39-40. To depict the operation of those systems, the figure includes a representation of a "member retailer computer" connected to a "retailer inventory system." However, neither the figure nor the associated text indicates that the inventory management system of the claims must be that of a retailer, as opposed to, for example, a wholesaler or a manufacturer. See id., col. 10. ll. 39-50; Fig. 2. In other passages quoted by the defendants, the specification simply points out that the systems and methods of the patent "permit retailers to make retail items in their inventory available to sponsors for association with incentive programs as prizes," id., col. 6, ll. 20-23, and "permit automated fulfillment of specific items listed in computer inventory systems of retailers at a retail location," id., col. 8, ll. 16-17. Those statements regarding the capabilities of the invention are not restrictive in nature and do not in any way suggest that the "inventory management systems" of the patent are limited to inventory management systems of conventional retailers.

Similarly, Figure 15 and the associated portions of the specification provide an "overview" of the "functions accomplished by the system and method of the present invention." See '830 patent, col. 12, line 9, through col. 15, line 56. Figure 15, however, is best understood as exemplary only; not all of the elements found in the figure, or in the portion of the specification that describes the figure, are required limitations of claims 1 and 19. From context, it is clear that the paragraph of the specification that describes the "participation of retailers in the present method" merely describes the manner in which the system and method can operate

when a retailer elects to offer prizes through an incentive program.  See '830 patent, col. 15, ll. 24-53.

In particular, Figure 15 shows the operation of the patented system when the promotional prize is awarded to a customer by a retailer.  The specification describes the figure as depicting the "participation of retailers in the present method and system."  Id., col. 15, ll. 24-25.  It explains that a retailer can "list information regarding prizes the retailer wishes to include in a menu of various prizes offered by the retailer."  Id., col. 15, ll. 38-40.  It adds that the "award database that is created by participation by the retailer is also connected via an electronic data exchange to the retailer's proprietary inventory system," which allows the award database to be "automatically updated to reflect the retailer's current inventory according to inventory numbers."  Id., col. 15,  ll. 41-46.  The Court does not interpret those portions of the specification as indicating that under the claimed system and method the term "inventory management system" refers only to an inventory management system maintained by a retailer.[1]

The defendants argue that in the brief Kroy filed before the PTAB, Kroy explicitly limited the "inventory management system" of the '830 patent to that of a retailer.  The Court has examined the brief and finds the defendants' argument on that score unconvincing.  The defendants quote portions of the brief in which Kroy referred to an amendment made in the course of the prosecution of the '830 patent.  In the brief, Kroy stated that "[t]he remarks accompanying the amendment emphasized, consistent with the specification, that this limitation

---

[1]  Other portions of the specification cited by the defendants are of the same general character.  They relate to Figures 2, 5, 13, and 15, all of which illustrate the operation of the invention as applied to retailers.  Accordingly, those portions of the specification naturally refer to retailers' inventory systems.  See '830 patent, col. 11, ll. 49-52; col. 20, line 58, through col. 21, line 2; col. 39, ll. 18-27; col. 46, ll. 24-29.

[the inventory management system limitation] refers to a system associated with retailers' inventory information, and not the award database on the host computer." <u>Preliminary Response of Patent Owner</u> (filed July 30, 2014), Dkt. No. 85-5, at 16. That statement, however, was not making the point that the inventory management system could only be associated with a retailer. Instead, it was making the point that the inventory management system was not associated with the award database on the host computer. Moreover, the brief separately stated that the inventory management system is "associated with providers, <u>such as retailers</u>, and manages inventory information regarding the providers' inventory of awards or products relating to awards." <u>Id.</u> (emphasis added). Thus, the brief supports Kroy's position that the inventory management system is that of providers "such as retailers," and is not exclusively limited to retailers, as that term is ordinarily used.

Other portions of Kroy's brief from which the defendants quote are equally unhelpful to the defendants' argument. The defendants quote Kroy's statement that "[t]he disclosed system integrates the incentive program host system with one or more retail inventory management systems to access retail inventory information . . . ." <u>Preliminary Response of Patent Owner</u> (filed July 30, 2014), Dkt. No. 85-5, at 5. But that quotation comes immediately after a sentence that reads: "The invention of the '830 patent is particularly advantageous for retailers who wish to sponsor personalized incentive programs to promote their products and/or services, reward loyal customers, attract new customers, drive retail foot traffic to their locations, etc." It is thus apparent that the reference to "retail inventory management systems" was in the context of the "particularly advantageous" use of the invention by retailers. Not only does the quoted matter not indicate that the invention is limited to retailers, but the previous sentence gives rise to the

opposite inference. Similarly, the brief's statement that the invention "provides a mechanism for tracking inventory data associated with retailers who participate in the sponsor's incentive programs," id. at 1, is merely a characterization of a feature of the invention, not a restrictive definition of its scope.

The defendants quote from the prosecution history of the '830 patent in which the applicants distinguished a prior art reference to Klug by arguing that, among other things, Klug "does not address access to any retailer, or any inventory systems of any providers, i.e., retailers." Again, however, that remark does not indicate that the '830 claims are limited to retailers, as that term is ordinarily understood; at most, it suggests only that retailers are likely to be the most common users of the invention.

Thus, the Court does not interpret the intrinsic evidence to support the defendants' effort limit the meaning of the term "inventory management system" to the inventory systems of "retailers," in the usual sense of that term. That is particularly true in light of the defendants' representation at the claim construction hearing that their use of the term "retailers" in this context is meant to refer to specific retail outlets. See Claim Construction Hearing Transcript, Dkt. No. 144, at 61-62. There is nothing in the record to suggest that the term "inventory management system" is limited to an inventory management system of retailers in general, and there is certainly nothing to suggest that the claim language is meant to be limited to the inventory systems of individual stores.

**b.** The defendants' second argument is that "in communication with" means "electronically connect[ed] . . . to" and that the patent requires that "the award database and the inventory management system" must be "electronically connected to one another via an

electronic data interchange."  There appears to be no dispute that the "communication" in question is electronic, since the computerized system described in the patent is entirely electronic.  However, Kroy fairly criticizes the defendants' proposal because it omits the requirement of "communication," which entails more than mere "connection."  The better construction of "in communication with" is simply "in electronic communication with."

As support for their contention that the inventory management system must be electronically connected to the award database, the defendants again rely on an excerpt from the specification describing the exemplary depiction of the invention in Figure 15.  For the same reasons given above, that example does not restrictively define the claim terms.  The defendants' citations to a submission that Kroy filed in the Safeway case is also unhelpful on this point, as the submission did not refer to a connection between the inventory management system and the award database, but instead referred to a "communication between the award fulfillment application program and the inventory management system."  See Plaintiff Kroy's Opposition to Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 101, case no. 2:12-cv-800, Dkt. No. 151, at 7.  Kroy's language, unlike the defendants', tracks the text of claims 1 and 19.  The Court therefore rejects the defendants' proposed construction, except to the extent that it includes the concept that the "communication" referred to in the claim language must be electronic in nature.

**c.**  The defendants next argue that the items in the inventory referred to in the "inventory management system" limitation should be specifically limited to "products or services."  In support of that argument, the defendants point to two excerpts from the specification.  Those passages, however, discuss the operation of the invention in the context of retail stores with

inventory consisting of products, or products and services. See '830 patent, col. 11, ll. 49-51 (referring to exemplary Figure 15); col. 44, ll. 1-34 (referring to "an embodiment of the invention" in which the customer visits a retail store to obtain his prize, in the form of either a product or services). Those passages therefore deal with particular embodiments. While those embodiments may be the ones most likely to be encountered in practice, the discussion of those embodiments in the specification does not address the full breadth of the inventions as claimed.

In support of the contention that the inventory management system should be construed as limited to tracking products and services, the defendants argue that it would make little sense for the inventory management system to contain information regarding the quantity of awards such as coupons or loyalty points. That argument, however, would seem to support limiting the inventory management system to products alone, as the term "inventory" is most naturally applied to products. Yet the defendants acknowledge that the inventory management system applies not only to products but also to services. If it is appropriate for a merchant to have an "inventory" of available services, such as the number of free car washes that a service station is prepared to provide as incentive rewards, it would seem no more unnatural to refer to an inventory of the number of frequent flyer miles that an airline is prepared to distribute to customers as loyalty awards. While a commercial inventory will often involve products, a company could offer a promotion in which the prizes were coupons redeemable for discounts on vacation trips, and the company could have an inventory of discount coupons that it is prepared to make available for various trips. Nothing would prevent that company's inventory management system from qualifying as the inventory management system of the '830 patent. Accordingly, the Court concludes that nothing in the patent or other evidence adduced by the

defendants requires that the items subject to the "inventory management system" are limited to products or services.

**d.** Finally, the defendants contend that the "inventory management system" should be a system that "provides a quantity of items" currently available for redemption in the retailer's inventory. In their claim construction brief, the defendants argued that an inventory must consist of a "listing," but shortly before the claim construction hearing, the defendants abandoned that argument in favor of their contention that an inventory management system is a system "that provides a quantity of items (i.e., products or services) or types of items (i.e., categories of products or services) currently available for redemption in a retailer's inventory." The defendants have provided no briefing in support of that claim construction.

While the term "quantity" is generally consistent with the concept of an inventory, an inventory is not limited to a measure of quantities of items, which might be suggested by defining inventory in terms of quantity. Moreover, the Court is not persuaded that the term "quantity" adds clarity to the unelaborated term "inventory" in the definition of "inventory management system." The Court therefore will not adopt the defendants' proposed definition of the limitation "in communication with an inventory management system."[2]

**e.** Starbucks proposes its own construction of "in communication with an inventory management system." Based on the specification and the prosecution history, Starbucks argues that an inventory management system must be capable of identifying the items currently available for redemption. For the reasons given above, the evidence does not support Starbucks'

---

[2] In their claim construction brief, the defendants acquiesced in the modification of their proposed claim construction of "an inventory management system," in accordance with Kroy's submission that the Court's construction should define the article "an" to mean "one or more."

argument that the inventory must be limited to products or services. However, the specification supports Starbucks' argument that the inventory management system must be able to perform the task of identifying the items available for redemption.

To be sure, the discussions of that function in the specification are in the context of particular embodiments of the invention. See '830 patent, col. 11, ll. 49-52; col. 15, ll. 44-47; col. 39, ll. 18-34. The prosecution history, however, provides stronger support for Starbucks' general point. In an August 26, 2002, amendment, the applicants distinguished a prior art patent to Kanter. See Amendment and Reply (filed Aug. 26, 2002), Dkt. No. 85-7, at 24-25. In so doing, the applicants stated that the claimed invention, unlike Kanter, allows sponsors to communicate with an inventory management system to obtain "real time knowledge and allocation of inventory," and allows an award to be "allocated from inventory to ensure availability upon a visit by the specific consumer user." Id. at 24.

Based on the parties' arguments, the Court will define the term "inventory management system" somewhat differently than it did in the Safeway case. The Court will construe the term "[in] communication with an inventory management system," which was not separately construed in the Safeway case, according to its plain terms, with only slight elaboration.

The Court's construction of "[in] communication with an inventory management system" is **"[in] electronic communication with an inventory management system."**

The Court's construction of "inventory management system" is **"at least one system that provides an inventory of items that are currently available for redemption."**

**2. "a sponsor-selected geographic location for fulfillment"**

The plaintiff's proposed construction of "a sponsor-selected geographic location for fulfillment" is: "at least one geographic location selected by a sponsor for fulfillment."

The defendants' proposed construction of "a sponsor-selected geographic location for fulfillment" is: "a geographic location selected by a sponsor for award fulfillment."

The Court's construction of "a sponsor-selected geographic location for fulfillment" in the <u>Safeway</u> case was: "at least one specific geographic location selected by a sponsor for fulfillment."

Analysis: There are only two differences between the parties' respective constructions: first, Kroy would add the phrase "at least one" as a modifier of "geographic location; and second, the defendants would add the term "award" before the word "fulfillment."

As to the first difference between the parties, the defendants argue that even though the word "a" generally means "one or more" in patent practice, it does not mean "one or more" in this setting, because the concept of a sponsor-selected geographic location for fulfillment necessarily entails the sponsor's selection of a single location. Otherwise, the defendants argue, it is the customer who selects the location for fulfillment.

That argument is unpersuasive. Even if the sponsor selects more than a single location for fulfillment, the location for fulfillment is still sponsor-selected; the customer is simply given the ability to choose among the locations designated by the sponsor. On the other hand, if there is effectively no selection done by the sponsor—for example, if the sponsor allows the customer

to redeem his award at any retail outlet owned or operated by the sponsor—the geographic location for fulfillment would not be sponsor-selected in any meaningful sense.[3]

Although the defendants argue that the specification and the prosecution history support their proposed claim construction, the Court does not find either to be enlightening on this issue. The portions of the specification cited by the defendants are exemplary illustrations of the invention, as shown in Figures 14, 15, and 24, and do not purport to describe the full scope of the claims. Likewise, the accompanying text in the specification merely describes those examples by reference to the "nearest retail location for fulfillment of the prize," '830 patent, col. 22, ll. 2-3; col. 46, ll. 29-33, or an instruction to the consumer to "go to store Y," id., col. 43, ll. 33-34. Those descriptions are plainly exemplary and not limiting. As for the prosecution history, the applicants added the claim language requiring "a sponsor-selected geographic location for fulfillment" at the suggestion of the examiner, but the defendants point to nothing in the prosecution record that suggests that the added language requires that the sponsor select only a single location.

As for the addition of the word "award" in the defendants' proposed claim construction, that is consistent with the use of the term "fulfillment" in the claims, which refer to the inventions as systems and methods for providing "automated award fulfillment." The reference to "fulfillment" in the portion of the claims dealing with sponsor-selected geographic locations

---

[3] The defendants acknowledge that "the geographic location can be broader than a single store, so long as it is a single geographic location, such as a zip code, area code or point of sale, not simply a store of the consumer's choosing." Dkt. No. 85, at 18. The defendants' position thus seems to be that a sponsor can offer a consumer the right to award fulfillment at any of one a group of stores, as long as those stores can be characterized as belonging to the same "geographic location," such as a zip code, an area code, or presumably even a region of the country. That concession seems to be at odds with the defendants' argument that if the consumer has a choice as to where to redeem his award, the geographic location limitation is not satisfied.

relates back to the award fulfillment to which the claims are generally directed. The Court will therefore adopt that portion of the defendants' proposed construction.

The Court's construction of "a sponsor-selected geographic location for fulfillment is: **"at least one geographic location selected by a sponsor for award fulfillment."**

**3. "a sponsor-selected specific award unit item"**

The plaintiff's proposed construction of "a sponsor-selected specific award unit item" is: "a specific award item and all the corresponding identifying or classifying information selected by a sponsor."

The defendants' proposed construction of "a sponsor-selected specific award unit item" is: "a specific award unit item selected by a sponsor and all of the corresponding identifying or classifying information."

The Court's construction of "a sponsor-selected specific award unit item" in the <u>Safeway</u> case was: "a specific award item and all of the corresponding identifying or classifying information selected by a sponsor."

Analysis: The use of the terms "award," "award unit," and "award unit item" in the patent gives rise to some difficulty in understanding the patent, particularly because the term "award unit item" is not defined in the specification. Nonetheless, as the Court noted in the claim construction order in the <u>Safeway</u> case, case no. 2;12-cv-8800, Dkt. No. 90, at 22-24, with some effort it is possible to make sense of the relationship among those terms and discern the meaning of the claim term "specific award unit item."

The term "award" is specifically defined in the patent to be synonymous with the word "prize." An "award" is defined as "encompass[ing] all types of incentives, including

merchandise, coupons, points, cash, services and other forms of incentives." '830 patent, col. 7, ll. 44-47. As for the term "award unit," the specification provides that items stored in the award database

> may include the method of fulfillment (i.e. by a third party, by a sponsor or by a retailer), identification numbers of the item, which may be accomplished by utilizing the retailer's inventory identifying data, a description of the item and the number of items available. In the case of retailer redemption, additional items could include a number assigned to the merchant, the merchant's store number, and the geographic location of the award or reward items, which may be sorted by zip code or area code. *The prize or reward and all of the corresponding identifying or classifying information can be characterized as an award unit.*"

Id., col. 41, ll. 11-22 (emphasis added).

Given the express definitions of the terms "award" and "award unit," Judge Payne in his claim construction order in the Safeway case concluded that a "specific award unit item" is best understood to mean "a specific award item and all of the corresponding identifying or classifying information." This Court agrees. The Court understands the term "award unit item" to be a single item consisting of all of the elements that make up an award unit, as that term is used in the patent. In that context, the best description of the award component of the award unit item is an "award item." That is the term that Judge Payne used in his construction of the claim term "a sponsor-selected specific award unit item," and this Court concludes that it constitutes the best available explanation for a set of terms that are, unfortunately and unnecessarily, rather opaque.

The Court's construction of "a sponsor-selected specific award unit item" is: **"a specific award item and all the corresponding identifying or classifying information selected by a sponsor."**

### 4. "award fulfillment"

The plaintiff proposes that no construction of the term "award fulfillment" is necessary.

Defendant Starbucks' proposed construction of "award fulfillment" is: "redemption of an award for a specific award unit item selected by a sponsor."

The defendants' alternative proposed construction of "award fulfillment" is: "redemption of a sponsor-selected award at a sponsor-selected location."

The Court in the Safeway case was not asked to construe the term "award fulfillment" and did not do so.

Analysis: The term "award fulfillment" is an unfamiliar term that has a special meaning in connection with its use in the '830 patent. The Court believes that construction of the term could prove useful to an understanding of the patent, and for that reason the Court will construe the term. In addition, lying beneath the dispute over the construction of the term "award fulfillment" is a fundamental disagreement among the parties as to the scope of the claims, which needs to be addressed.

The evidence in the record supports Starbucks' proposed construction of the term "award fulfillment." Figure 22 of the patent depicts "the basic steps of award fulfillment." '830 patent, col. 41, ll. 3-4. In describing the process depicted in Figure 22, the specification explains that after "the consumer wins an award," the award fulfillment is concluded when "the award is redeemed." Id., col. 41, ll. 6-9. The prosecution history likewise supports Starbucks' proposed construction. During prosecution, the applicants characterized "automated award fulfillment" as a process in which "a sponsor of a program designates what award will be provided and the location for redemption by the consumer user." Amendment and Reply (June 8, 2001), Dkt. No. 85-16, at 16. See also Amendment and Reply (August 26, 2002), Dkt. No. 85-8, at 24 ("Automated award fulfillment, according to the present invention, includes sponsor designated

18

or selected redemption whereby the sponsor . . . may designate the location of the redemption.");

Reply and Request for Reconsideration (Jan. 25, 2002), Dkt. No. 85-15, at 26 (in the case of automated award fulfillment, "a sponsor of a program designates what award will be provided and the location for redemption by the consumer user.").

The Court's construction of the term "award fulfillment" is: **"redemption of an award for a specific award unit item selected by a sponsor."**

While the Court could stop with simply defining the term "award fulfillment," that would not address the central dispute among the parties that relates to what steps in the process of award fulfillment are required by the claims. The defendants argue that the claims require that the customer actually redeem the award. Kroy argues that the claims do not require the act of redemption by the customer, but require only actions by the sponsor, up to and including designating the specific award to be redeemed and designating the geographic location for redemption. On this issue, the Court agrees with Kroy.

By their terms, neither claim 1 nor claim 19 contains any limitation requiring actual redemption of the award by the customer. Claim 1 recites that the "automated award fulfillment application program provides sponsor-selected fulfillment," and the claim further recites that the "automated award fulfillment program" comprises code adapted to provide "a sponsor-selected award unit item tailored to demographic and psychographic preferences of a sponsor-selected consumer user," and code adapted to provide "a sponsor-selected geographic location for fulfillment." Those limitations are all directed to features of the program. They do not require any action on the part of the consumer, such as actual redemption of the award. Nor would the act of redemption by the consumer be a feature of the recited program.

With respect to claim 19, the step of "providing automated award fulfillment" comprises "providing sponsor-selected fulfillment," which further comprises providing "a sponsor-selected specific award unit item," providing that item "tailored according to demographic and psychographic preferences of a sponsor-selected consumer user," and providing "a sponsor-selected geographic location for fulfillment."  The claim does not recite a step in which the consumer actually redeems the award.  Thus, even though "award fulfillment" refers to redemption of an award, the claimed method for providing automated award fulfillment is not required to include the final step of redemption of the award.  By analogy, a method for selling sports cars could include various promotional steps designed to promote sales, but it would not be necessary for it to require that any customer actually buy a car.

The defendants argue that Kroy's position on this issue is inconsistent with the specification and the prosecution history, but the Court is not persuaded that it is.  With respect to the specification, the defendants rely on Figure 22 and the accompanying text, '830 patent, col. 40, line 59, through col. 41, line 10.  In particular, the defendants rely on the statement in the specification that at step 658 in Figure 22, "the award is redeemed at a retailer using a card."  Id., col. 41, l. 8-9.  The figure and the pertinent discussion in the specification, however, merely describe the overall process of redemption as applied when redemption occurs at a retail location.  Typically, that process will conclude with the customer's receipt of the award at the retailer's location., as the specification states.  But that does not mean that claims 1 or 19, although directed to a system and method for award fulfillment, require the performance of each step in the redemption process, nor does the specification so indicate.

The prosecution history is also unhelpful to the defendants. The references they cite do not indicate that the act of redemption by the consumer is a limitation of either claim 1 or claim 19. Instead, the reference on which they principally rely characterizes the "automated award fulfillment" as permitting "a sponsor of a program [to designate] what award will be provided and the location for redemption by the consumer user." Amendment and Reply (filed June 8, 2001), Dkt. No. 85-17, at 16. The same is true of the other portions of the prosecution history cited by the defendants, which identify sponsor selection of the award and sponsor selection of the location for redemption as features of the "automated award fulfillment," but do not identify actual redemption by the consumer as a required step. See Amendment and Reply (filed Aug. 26, 2002) ("Automated award fulfillment, according to the present invention, includes sponsor designated or selected redemption whereby the sponsor of the award may select or determine what award unit . . . will be provided to the consumer user . . . and may designate the location of the redemption . . . ."); Reply and Request for Reconsideration (filed Jan. 25, 2002), Dkt. No. 85-15, at 25 ("Automated award fulfillment, according to the present invention, includes sponsor designated or selected redemption whereby the sponsor of the award may select or determine what award . . . will be provided to the consumer user, and may designate the location of the redemption . . . .").[4]

---

[4] Citing one of Kroy's filings from the Safeway case, the defendants argue that in that case Kroy conceded that the consumer's act of redemption is a required element of the asserted claims. See case no. 1:12-cv-800, Dkt. No. 62, at 2. The Court does not interpret that filing in the way the defendants do. The issue Kroy was addressing in the cited passage was the defendants' contention that "automated award fulfillment" excludes customer participation in the act of redemption. While Kroy's language in the filing was imprecise, the point of Kroy's response was that the claims are not inconsistent with consumer participation in the award redemption. That is quite different from conceding that consumer redemption is a limitation of the asserted claims.

Based on a close examination of the claim language and the cited portions of the specification and the prosecution history, the Court concludes that the act of award redemption by the consumer is not a required limitation of either claim 1 or claim 19.

**5. "host"**

The plaintiff's proposed construction of "host" is: "any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company."

The defendants' proposed construction of "host" is: "any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company, and for creation of databases of retail, catalog, sponsor and other items that permit automated fulfillment of specific items listed in computer inventory systems of retailers at a retail location."

---

The Court is also not persuaded that a document submitted by one of the inventors to show the date of conception amounts to a concession that customer redemption is a required limitation of both claim 1 and claim 19. The statement in the document that "[a]ward fulfillment is the process by which declared prize winners redeemed promised awards from contest sponsors," Dkt. No. 85-17, at 4, is a general characterization of the award fulfillment process; it does not purport to be a representation as to the precise scope of the asserted claims.

Finally, a reference from the prosecution history that the defendants cited at the claim construction hearing, but not in their brief, provides no support for their argument. In that reference, Reply and Request for Reconsideration (filed Oct. 23, 2003), Dkt. No. 82-3, at 117-48, the applicants distinguished a prior art patent to Scroggie on the ground that Scroggie "merely designates the actual delivery to a 'fulfillment house,' . . . whereas the present invention allows the sponsor to coordinate the delivery of the award, or, alternatively, to designate to the consumer where the award may be retrieved." Id. at 146. That remark focuses on the actions of the sponsor in dictating where the award will be redeemed, not on the customer's actual act of redemption.

The Court in the Safeway case construed the term "host" as: "any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company."

Analysis: Both the plaintiff's and the defendants' proposed constructions are taken directly from the definition of "host" in the patent.  See '830 patent, col. 8, ll. 10-17.  The only difference between the two is that Kroy's proposed construction omits the last portion of the definition.  Kroy argues that the last portion of the definition is unnecessary because it simply reiterates matters already required by the claims.

The shorter version of the definition would be more intelligible to a jury than the longer version.  Moreover, the last portion of the definition given in the specification describes the function of the host rather than being essential to the definition of the term.  And that function is set forth in other limitations of the claims.  This issue does not appear to involve a serious substantive disagreement among the parties, and in the Court's view, neither proposed construction would be erroneous.  However, the Court deems it preferable to use the shorter and more readily understandable version of the definition.

The Court's construction of the term "host" is:  **"any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company."**

**6.  "incentive program" and "incentive programs"**

The plaintiff's proposed construction of the term "incentive program" is: "any program for creating incentives."

The defendants' proposed construction of the term "incentive program" is: "any program for creating incentives which includes an algorithm that instructs the HTTP server to send a message to the consumer database updating the consumer database to reflect that the consumer has won an incentive program."

The Court in the <u>Safeway</u> case did not construe the terms "incentive program" or "incentive programs."

Analysis: The specification explicitly defines "incentive program" as follows: "The phrase 'incentive program' should be understood to include any program for creating incentives, including programs within a sponsoring firm, such as employee incentive programs, and outside the firm, such as customer promotions." '830 patent, col. 7, ll. 38-42; <u>see also</u> <u>id.</u>, col. 1, ll. 39-43 ("Incentive programs offer awards and incentives to modify behavior of individual consumers and to direct the consumers to some pre-determined action, such as purchase of products or services upon visiting a retail site, viewing advertising, testing a product, or the like."). That definition is consistent with the definition proposed by Kroy and the one adopted by the Court in the <u>Safeway</u> case.

The defendants urge that the Court use definitional language taken from a different part of the specification, where the specification addresses a "host incentive program" and states that such a program "is required to include, as part of the program, an algorithm that instructs the HTTP server to send a message to the consumer database that updates the consumer database to reflect that the consumer has won that incentive program." <u>Id.</u>, col. 26, ll. 55-60. Those additional requirements, however, are referred to only in connection with certain embodiments discussed in the specification. In particular, the specification discloses embodiments, such as

those based on Figure 15, that include a host system with an HTTP server and a consumer database.  It is in the context of those embodiments that the specification refers to an algorithm that instructs the HTTP server to update the consumer database when the consumer wins a particular incentive program award.  The language urged by the defendants is therefore not necessary or appropriate as a definition for the general terms "incentive program" and "incentive programs."

The Court's construction of the terms "incentive program" and "incentive programs" is: **"any program[s] for creating incentives."**

### 7.  **"provider"** and **"providers"**

The plaintiff's proposed construction of the term "provider" is:  "individual or company that offers or provides an incentive program or provides awards associated with an incentive program."

The defendants propose that no construction is necessary for the term "provider" apart from the construction of the term "providers."

The plaintiff proposes that no construction of the term "providers" is necessary apart from the definition of the terms "provider" and "plurality of providers."

The defendants' proposed construction of the term "providers" is:  "individuals or companies that wish to offer or provide incentive programs or provide awards associated with an incentive program."

The Court in the <u>Safeway</u> case construed the term "provider" as:  "individual or company that offers or provides awards associated with an incentive program."

Analysis: There is very little difference between the competing definitions of "provider" and "providers." The dispute over whether the Court should define the term "provider" or instead define only the term "providers" is silly. The Court will define the term in the singular, fully confident that an English-speaking jury required to deal with the term "providers" would be fully capable of extrapolating from the singular to the plural.

The defendants propose to use the words "wish to offer or provide incentive programs" in place of Kroy's suggestion of "offers or provides awards associated with an incentive program." The defendants offer the terms "wish to" because those words are used in the patent's definition of the related terms "retailer," "sponsor," and "host." Kroy's proposal, however, is more straightforward, and since there is no suggestion from either side that the difference in wording would make a whit of difference as a practical matter, the Court will adopt Kroy's proposed language as part of its construction.

The Court's construction of the term "provider" is: **"individual or company that offers or provides an incentive program or provides awards associated with an incentive program."** To the extent that it is necessary to construe the term "plurality of providers," the Court's construction is: **"one or more providers."**

**8. "psychographic preferences"**

The plaintiff's proposed construction of the term "psychographic preferences" is: "preferences associated with a consumer's attitudes, interests, values, opinions, lifestyles, or behaviors."

The defendants argue that the term "psychographic preferences" is indefinite. In the alternative, their proposed construction of the term "psychographic preferences" is: "preferences based on a consumer's attitudes, interests, values, opinions, or lifestyle."

The Court in the <u>Safeway</u> case held that the term "psychographic preferences" is not indefinite. The Court construed the term to mean: "preferences associated with a consumer's attitudes, interests, values, opinions, lifestyles, or behaviors."

Analysis: The Court will address the claim construction issue first and then the defendants' argument that the term "psychographic preferences" is indefinite.

**a.** With respect to the issue of claim construction, there are two differences between the parties' proposed constructions: (1) Kroy uses the term "associated with" to describe the relationship between preferences and the listed factors, while the defendants use the term "based on"; and (2) Kroy includes the term "behaviors" among the listed factors, while the defendants include all the other common factors, but omit that one. The Court favors Kroy's construction on both points, for the following reasons.

First, the terms "associated with" and "based on" convey the same general concept, but the term "associated with" is more precise than "based on" for describing the relationship between the listed factors and customers' preferences. For example, a consumer who has shown an interest in professional baseball might be thought to be a good candidate for marketing football merchandise; in such a case, a willingness to purchase football-related products might be thought to be "associated with" a demonstrated interest in baseball, but would not necessarily be said to be "based on" such an interest.

Second, it is appropriate to include "behavior" among the listed factors in the definition of psychographic preferences. Patterns of behavior—particularly the forms of behavior that are of interest to marketers, such as purchasing habits—are closely related to lifestyle; conduct consisting of a pattern of purchases could either be characterized as a form of behavior or could be regarded as indicative of a particular lifestyle. And the defendants acknowledge that "lifestyle" is a proper factor to include in the definition of "psychographic preferences." Moreover, behavior is often associated with, and indicative of, "interests," another term that the defendants agree should be included in the definition of "psychographic preferences." A person who purchases large amounts of fly-fishing equipment would be exhibiting a type of behavior from which it could be inferred that the person is interested in fly fishing. The inclusion of the term "behavior" therefore does not constitute a significant departure from the definition already agreed upon by the defendants.

The defendants' expert, Dr. Michael Lewis, testified at the claim construction hearing that a person of skill in the art would not consider it proper to include "behavior" in the definition of "psychographic preference." Claim Construction Hearing Transcript, Dkt. No. 144, at 14-15. Citing what he characterized as a leading textbook on marketing, Philip Kotler, Marketing Management (11th ed. 2003), Dr. Lewis testified that behavior is "a fundamentally different type of variable" that is treated separately from demographic and psychographic variables. Claim Construction Hearing Transcript, Dkt. No. 144, at 15-17.

There are two problems with Dr. Lewis's testimony about whether "behavior" qualifies as a factor considered in the psychographic analysis. First, the intrinsic evidence in this case, about which Dr. Lewis did not testify, shows that the term "psychographic preferences," as used

in the '830 patent, is intended to include consideration of behavior. Second, several of the references offered by the defendants in support of Dr. Lewis's testimony also refer to behavior as one of the factors that bears on psychographic analysis.

As to the first problem with Dr. Lewis's testimony, the specification and the prosecution history provide support for construing the claim language as including "behavior" in the list of factors associated with psychographic preferences. Describing the embodiment of Figure 15, the specification explains that the sponsor can "obtain information regarding consumer participation in [the] sponsor's incentive programs. Thus, the sponsor can obtain psychographic, demographic, or other information relevant to the participation of consumers in sponsor's incentive programs." '830 patent, col. 15, ll. 17-23. Regarding another embodiment, the specification notes that the system "tags a purchase in order to store information about consumer behavior." Id., col. 42, ll. 54-56. And regarding still another embodiment, the specification touts the system's in-store connectivity "in order to monitor purchasing behavior." Id., col. 40, ll. 1-3. Finally, in the course of the prosecution, the applicants referred to psychographic criteria as "behavior based demographic" criteria. Response to Non-Final Office Action (filed Oct. 23, 2003), Dkt. No. 82-3, at A742. Those excerpts from the specification and the prosecution history all suggest that the patent uses the term "psychographic preferences" to refer to preferences that are associated with factors that include consumer behavior, and in particular purchasing behavior.

As to the second problem with Dr. Lewis's testimony, the Court finds that the extrinsic evidence introduced in the claim construction proceedings did not provide clear support for his position. At the outset, the Court notes that, as the defendants complain, the evidence Kroy cites

in support of its definition of "psychographic preferences" is thin. Kroy did not offer any expert evidence on this issue, and the extrinsic evidence Kroy cited in its brief consisted of a single definition from an on-line dictionary and a Wikipedia article from the Internet. The dictionary reference provides a useful definition of "psychographics" as "market research or statistics classifying population groups according to psychological variables (as attitudes, values, or fears)." However, the dictionary definition contains no reference to "behavior," and therefore does not support Kroy's argument that the word "behavior" should be included in the construction of the term "psychographic preferences."[5] For what it is worth, the Wikipedia article on the word "psychographic" refers to "psychographic variables" as including "beliefs, attitudes, values and behaviors." In addition, the Wikipedia article refers to the categories of psychographic factors used in market segmentation as including activity, interest, opinion, attitudes, values, and behavior. http://en.wikipedia.org/wiki/Psychographic.

While Kroy's extrinsic evidence on the "behavior" issue is thin, the weaknesses in Kroy's extrinsic evidence are compensated for by evidence that was introduced through the defendants' expert, Dr. Lewis, and evidence submitted in connection with the defendants' claim construction brief. That evidence included several references that support the view that psychographic traits are associated with behavior. For example, Peter D. Bennett, Dictionary of Marketing Terms (2d ed. 1995), published by the American Marketing Association, defines "psychographic analysis," for purposes of "consumer behavior," to refer to a technique "that investigates how people live,

---

[5] Kroy cited to the on-line version of Merriam-Webster's Collegiate Dictionary and listed the date for that source as 2013. The defendants criticize that reference as being published long after the date of the application in this case. However, the print version of the Merriam-Webster dictionary that is more nearly contemporaneous with the application contains exactly the same definitional language. Merriam-Webster's Collegiate Dictionary 1004 (11th ed. 2003).

what interests them, and what they like; it is also called life style analysis or AIO because it relies on a number of statements about a person's activities, interests, and opinions." See Dkt. No. 85-23, at 7. Another dictionary in the marketing field, Wolfgang J. Koschnick, Dictionary of Social and Market Research (1996), defines "psychographics" to mean "[t]he categorization of a market or other population groups, e.g., consumers, on the basis of psychological—as distinguished from demographic—dimensions, including activities, interests, opinions, values, attitudes, lifestyles, personality traits, such as innovativeness, sophistication, etc." Dkt. No. 85-22, at 4. Both of those sources define the term "psychographic" with reference, inter alia, to activities, which is to say, behavior.

Some of the references specifically relied on by Dr. Lewis echo the same theme. A 1975 paper by Wells entitled Psychographics: A Critical Review, Dkt. No. 85-6, at 18, refers to psychographic researchers looking into "activities, interests, opinions, needs, values, attitudes, and personality traits." At the hearing, Dr. Lewis acknowledged that the term "activities," as used in the Wells article, is another word for "behavior." Claim Construction Hearing Transcript, Dkt. No. 144, at 28. The Wells article provided, as an example, a "psychographic profile" of a heavy user of shotgun ammunition, in which several of the factors involved interests and opinions, while other factors involve activities or behavior. And a 1984 paper by Anderson and Golden, entitled Lifestyle and Psychographics: A Critical Review and Recommendation, Dkt. No. 85-6, at 38, noted that psychographic research has sometimes been known as "lifestyle" or "activity and attitude" research. The paper added: "Contemporary interpretations in the marketing literature generally define lifestyle to encompass both characteristic patterns of overt behavior and cognitive processes and properties, including such dimensions of personality as

values, attitudes, opinions, belief and interests." Id. at 41. Thus, Dr. Lewis's authorities link behavior to lifestyle and to the analysis of psychographic factors generally.

While Dr. Lewis stated in his declaration and in his testimony that a person of ordinary skill would not have considered "psychographic preferences" to include "behaviors," he admitted upon questioning that the terms "psychographic analysis" and "lifestyle analysis" "tend to be used interchangeably." Claim Construction Hearing Transcript, Dkt. No. 144, at 38. He also agreed that, as a general matter, "certain behaviors tend to be associated with certain lifestyles." Id. at 39-40.

Although the Court found Dr. Lewis to be a generally credible and knowledgeable witness, the Court did not find his testimony persuasive on the question whether "behavior" can properly be considered a factor bearing on "psychographic preferences." His testimony did not take any account of the intrinsic evidence in the '830 patent, and it was, at minimum, in tension with some of the references that the defendants themselves introduced in support of their claim construction submission. The Court therefore does not credit Dr. Lewis's testimony that the term "psychographic preferences," as used in the '830 patent, should not be understood to include consideration of "behavior." Accordingly, based on the intrinsic and extrinsic evidence that was called to the Court's attention, the Court concludes that it is proper to include the term "behavior" in the definition of "psychographic preferences," as that term is used in the '830 patent.

The Court's construction of the term "psychographic preferences" is: **"preferences associated with a consumer's attitudes, interests, values, opinions, lifestyles, or behaviors."**

**b.**  As part of their claim construction argument, the defendants contend that the term "psychographic preferences" is indefinite.  They argue that the meaning of the term "psychographic preferences," as used in the '830 patent, would not have been reasonably clear to a person of skill in the art at the time of the application.  That argument, if accepted, would have the effect of rendering all of the asserted claims invalid.  See Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120 (2014).

Raising the issue of indefiniteness in the course of claim construction proceedings is appropriate.  As the Federal Circuit has explained, "indefiniteness is a question of law and in effect part of claim construction."  ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 517 (Fed. Cir. 2012); see also Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1379 (Fed. Cir. 1999) (indefiniteness "is inextricably intertwined with claim construction"); Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.").  However, in light of the statutory presumption of patent validity, 35 U.S.C. § 282, the standard for holding a patent invalid for indefiniteness is exacting.  The Federal Circuit has stated that a patent may be held invalid for indefiniteness only upon a showing of clear and convincing evidence.  See Halliburton Energy Servs., Inc. v. M-I LLC, 524 F.3d 1244, 1249-50 (Fed. Cir. 2013); Young v. Lumeris, Inc., 492 F.3d 1336, 1345-47 (Fed. Cir. 2007); Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1366 (Fed. Cir. 2003); Endo Pharms. Inc. v. Watson Labs., Inc., 2014 WL 2859349, at *8 (E.D. Tex. June 23, 2014); L.C. Eldridge Sales Co. v. Azen Mfg. Pte., Ltd., 2013 WL 2285749, at *1 (E.D. Tex. May 23, 2013).  Based on the evidence adduced in the claim construction proceedings, the Court

is not prepared to find that the defendants have shown, by clear and convincing evidence, that the asserted claims are indefinite.[6]

The defendants' indefiniteness argument rests largely on the declaration and testimony of Dr. Lewis. At the claim construction hearing, Dr. Lewis testified that in light of the reference to "psychographic preferences" in the asserted claims, there are "significant problems" with "the scope of the invention being understandable by a person skilled in the art" at the time of the application in 1997. In particular, he identified two problems with the use of the term "psychographic preferences" in the patent. First, he said that the combination of "psychographic" and "preferences" gave rise to "an implicit type of design or algorithm that's beneath the surface in that in terms of how do we take psychographic traits or variables and, you know, take those, develop psychographic segments, and from there map those to consumer needs and preferences. The patent is silent in terms of that mechanism or that procedure." Claim Construction Hearing Transcript, Dkt. No. 144, at 10. Second, he said that "[d]uring this time period and really up until the present day, the term 'psychographic' has been extremely muddled in terms of a bunch of alternative definitions. And, so, it would be very difficult for a person skilled in the art to understand the scope of the patent." Id. at 10-11.

Dr. Lewis's first point—that the patent does not teach how to "develop psychographic segments" and "map those to consumer needs and preferences"—does not pertain to

---

[6] The case of Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., No. 13-854 (S. Ct.), which is currently pending before the Supreme Court, involves questions relating to a claim of indefiniteness raised in the course of claim construction proceedings. It is possible that the Teva case could affect the analysis in this case. However, that case principally concerns the standard of review of determinations made by district courts in the course of claim construction proceedings, so the Court sees no reason to postpone issuance of this claim construction order pending the Supreme Court's decision in Teva.

indefiniteness at all, but instead is directed to lack of enablement. Dr. Lewis's testimony in that regard therefore does not support the defendants' indefiniteness contention.

Dr. Lewis's second point—that the term "psychographic," as used in the marketing field, "has been extremely muddled in terms of a bunch of alternative definitions—is addressed to the use of the term "psychographic" in the marketing field generally, not to the use of the term in the particular context of the '830 patent. The Court therefore does not find Dr. Lewis's testimony particularly persuasive with regard to how a person of ordinary skill in the art would understand the meaning of the term "psychographic preferences" as it is used in claims 1 and 19.

Although Kroy did not introduce expert testimony on the issue of indefiniteness, the evidence pertinent to claim construction, summarized in part 8a, above, provides significant guidance as to the meaning of the term "psychographic preferences," as that term is used in the patent. First, and contrary to Dr. Lewis's testimony, the extrinsic evidence introduced by both parties showed that there is substantial agreement as to the core meaning of the term "psychographic" as that term is used in expressions such as "psychographic research." Each of several dictionaries in the field of marketing, published roughly contemporaneously with the application in this case, defined the term similarly, and those definitions were similar to the definitions proposed by the parties. Significantly, the fact that the definitions offered by the respective parties are so close to identical is some indication that the term "psychographic preferences" has a core meaning that is generally well understood. While the parties disagreed about whether the term "behavior" should be included in the Court's construction of the term, the definitions in the marketing dictionaries, and the discussions in the papers by Wells and by

Anderson and Golden, showed that "behavior" is widely regarded as a factor associated with psychographic characteristics.

The defendants argue that while the term "psychographic" has been used by persons of skill in the marketing field for some time, the term "psychographic preferences," which is used in the '830 patent, is not known in the field and is indefinite even if the term "psychographic" has a reasonably well-settled meaning. While the term "psychographic preferences" may be clumsy and is not a term commonly used in the field of marketing, its meaning is nonetheless reasonably clear. The term simply refers to preferences that are associated with psychographic, as opposed to demographic, factors.

The context in which the term "psychographic preferences" is used in the claims supports that interpretation. The limitation in which the disputed term appears refers to a "sponsor-selected specific award unit item being tailored to demographic and psychographic preferences of a sponsor-selected consumer user." That is, the limitation requires that the sponsor select prizes tailored to preferences of the consumer, where those preferences are ascertained through analysis of demographic and psychographic factors. Demographic factors are well understood to be objective characteristics such as age, sex, ethnicity, and the like; the use of "psychographic" in the patent in juxtaposition with "demographic" lends support to the understanding that psychographic factors are subjective characteristics, such as attitudes, interests, values, and opinions, and the expression of those characteristics in lifestyle and behavior.

The specification repeatedly uses the term "psychographic" in combination with the term "demographic," in referring to information about customers compiled as a result of their participation in incentive programs. <u>See</u> '830 patent, col. 13, ll. 18-21 (noting that a

"psychographic or demographic sub-record" can be compiled that "may include information obtained through consumer responses to inquiries answered by the consumer during participation in incentive programs."); id., col. 15, ll. 16-23 (sponsor can query the consumer database "to obtain information regarding consumer participation in that sponsor's incentive programs," thereby obtaining "psychographic, demographic, or other information relevant to the participation of consumers in sponsor's incentive programs"); id., col. 18, ll. 47-51 (information "relating to a consumer's participation in the sponsor's incentive programs" may include "demographic or psychographic information about the types of consumers who are participating"); id., col. 41, ll. 62-67 ("A demographic and psychographic sub-record may include sub-records that include information obtained from consumers through the consumer's participation in each of the sponsor's incentive programs, such as survey-completion and question-and-answer incentive programs."). As in the case of the juxtaposition of "demographic" and "psychographic" in the claims, the use of the two terms together in the specification supports the inference that psychographic factors are those factors other than objective demographic characteristics that are associated with a customer's purchasing preferences.

Based on all the evidence adduced in the claim construction proceedings, and applying the governing standard of proof, the Court finds that the meaning of the term "psychographic preferences," as used in the '830 patent, would be reasonably clear to a person of ordinary skill in the field of marketing. The legal consequence of that finding is that the term "psychographic preferences" is not indefinite and the asserted claims of the '830 patent are not invalid for indefiniteness. See Nautilus, 134 S. Ct. at 2129 (a patent's claims are not indefinite if the claims,

"viewed in light of the specification and prosecution  history, inform those skilled in the art about the scope of the invention with reasonable certainty.").   Accordingly, the Court denies defendants' request that the Court hold the term "psychographic preferences" to be indefinite.

IT IS SO ORDERED.

SIGNED this 23d day of December, 2014.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE